[Cite as *State v. Barger*, 2017-Ohio-4008.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27257 |
| | : | |
| v. | : | Trial Court Case No. 2014-CR-3711 |
| | : | |
| BRENT E. BARGER | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . 

# O P I N I O N

Rendered on the 26th day of May, 2017.

. . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

THOMAS KOLLIN, Atty. Reg. No. 0066964, 2372 Lakeview Drive, Suite H, Beavercreek, Ohio 45431
      Attorney for Defendant-Appellant

. . . . . . . . . . . . 

WELBAUM, J.

{¶ 1} Defendant-appellant, Brent Barger, appeals from his conviction and sentence, following a no-contest plea, on one count of Operating a Motor Vehicle while Under the Influence of Alcohol and one count of Aggravated Vehicular Homicide.

{¶ 2} In support of his appeal, Barger contends that the trial court erred in failing to grant his motion to suppress. According to Barger, the arresting officer lacked probable cause to arrest Barger, the blood samples obtained from Barger after his arrest were not taken and stored in substantial compliance with the Ohio Administrative Code, and the blood samples were drawn as part of an unreasonable search and seizure conducted outside of the three-hour period provided in the search warrant.

{¶ 3} After considering the record, we conclude that the trial court did not err in overruling the motion to suppress. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} At approximately 9:39 P.M. on June 25, 2014, Officer Day of the West Carrollton Police Department was dispatched to the scene of a crash involving a motor vehicle driven by Brent Barger and a motorcycle at the intersection of Alex Bell Road and Kimberly Lane in West Carrollton. Upon arriving at the scene, Officer Day assisted Officer Flaute in performing C.P.R. on the motorcyclist. Shortly thereafter, members of the West Carrollton Fire and Paramedic Squad arrived at the accident scene and relieved the police officers in the first aid administration.

{¶ 5} Officer Day then spoke with Dana Combs, an eyewitness to the accident.

Ms. Combs explained that Barger's car turned left in front of the motorcyclist. The motorcycle crashed into the passenger side of Barger's vehicle. Tr. 9-11. Officer Day noticed Barger's silver car was parked on Kimberly Lane and had sustained damage on the passenger side front. Officer Day also noticed dents in the car and shattered headlight and headlight lenses.

{¶ 6} Officer Day then spoke with Barger, who was sitting on the sidewalk. According to Officer Day, Barger was somewhat quiet and when he spoke to the officer, Barger looked down and away. *Id.* at 13. While Barger was speaking and looking away, Officer Day noticed the odor of alcohol coming from Barger. *Id.* at 14. The odor became stronger when Barger stood up. At that point, Officer Day noticed that Barger's eyes were glassy, bloodshot, and dilated. *Id.* at 15. When Officer Day asked Barger if he had consumed any alcoholic beverages that evening, Barger replied "no" in a "[v]ery stringent, very militarized type of stance, very stiff, very uncharacteristic of talking to somebody about, asking them normal questions." *Id.* Officer Day asked Barger to perform field sobriety tests, but Barger refused.

{¶ 7} At about 10:30 P.M., Barger was placed under arrest by Officer Day. *Id.* at 16. Barger was placed in the rear of the police car for the purpose of being transported to the West Carrollton Police Department. Officer Day intended to photograph Barger at the police department and also acquire his fingerprints. Officer Day began to drive from the scene of the accident to the West Carrollton Police Department when he received a message from his supervisor. The officer was rerouted to go to Sycamore Hospital for the possible administration of a blood test. Barger was transported to Sycamore Hospital and secured in a room.

{¶ 8} At 12:24 A.M., Sargent Flynn obtained the signature of a municipal judge on a search warrant. He then drove directly from the judge's house to Sycamore Hospital to obtain blood samples from Barger. The search warrant was executed and blood was drawn at 1:05 A.M.

{¶ 9} The motorcyclist involved in the accident with Barger died. Subsequently, Barger was indicted by the Montgomery County Grand Jury on one count of Operating a Motor Vehicle while Under the Influence of Alcohol in violation of R.C. 4511.19(A)(1)(a), a misdemeanor of the first degree, and one count of Aggravated Vehicular Homicide in violation of R.C. 2903.06(A)(2), a felony of the third degree. Barger filed a motion to suppress evidence obtained from him after the June 25, 2014 accident. Dkt. 24, 48. The trial court overruled Barger's motion. Dkt. 32, 57, 74.

{¶ 10} On July 6, 2016, Barger pled no contest as charged. The trial court found Barger guilty of both charges and sentenced him to concurrent terms of 180 days in jail for the Operating a Motor Vehicle while Under the Influence of Alcohol offense and 18 months in prison for the Aggravated Vehicular Homicide offence. Dkt. 93. Barger now appeals from his conviction and sentence.

## II. The Trial Court Did Not Err in Denying the Motion to Suppress

{¶ 11} Barger's sole Assignment of Error states that:

The Trial Court Erred When It Overruled Appellant's Motion to Suppress.

{¶ 12} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the

credibility of witnesses." (Citation omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. * * * Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citations omitted.) *Id.*

{¶ 13} Based on our review of the record, we conclude that the factual findings made by the trial court are supported by competent, credible evidence. We will now determine whether these factual findings support the trial court's decision to overrule Barger's motion to suppress.

A. Officer Day Had Probable Cause to Arrest Barger

{¶ 14} Barger first contends that the trial court erred in finding that the arresting officer had probable cause to place Barger under arrest. According to Barger, probable cause was lacking because the arresting officer did not notice any soiled clothing, fumbling fingers, alcohol containers, drugs, drug paraphernalia, bruises, bumps, fractures, slurred speech, inconsistent responses, abusive language, or unusual statements. Barger Brief, p. 5.

{¶ 15} "Probable cause to arrest exists when a reasonably prudent person would believe that the person to be arrested has committed a crime." *State v. Adams*, 2d Dist. Montgomery No. 24184, 2011-Ohio-4008, ¶ 7. Probable cause is a concept that must be based on the totality of circumstances. *State v. Turner*, 2d Dist. Montgomery No. 27065, 2016-Ohio-7983, ¶ 19.

{¶ 16} The trial court found that there was probable cause to arrest Barger, stating, in part (Dkt. 32, p. 6):

Officer Day had information of a crash from Dana Combs. Dana Combs was identified and had no history of providing inaccurate information. She is a reasonably trustworthy source. Dana Combs said that the silver car turned in front of the motorcyclist. Officer Day was able to see the damage on the passenger's side of the silver car. Officer Day was able to observe the glassy bloodshot eyes of the Defendant, the admitted driver of the silver car. Officer Day was able to smell the odor of alcohol about Defendant's person. Officer Day observed the relatively unusual behavior of Defendant, in that Defendant refused to make eye contact during questioning and a [sic] made very short responses. Given all these circumstances, it is reasonable to conclude that the police officer had probable cause to arrest Defendant for driving under the influence.

{¶ 17} Officer Day testified that he had received training in detecting whether a person was driving while under the influence of alcohol. Tr. 8. On the evening of Barger's motor vehicle accident, Officer Day arrived at the scene of the accident at approximately 9:39 P.M. After assisting another officer in performing C.P.R. on the motorcyclist, Officer Day spoke with Dana Combs, an eyewitness to the accident. Ms. Combs explained that Barger's car turned left in front of the motorcyclist. *Id.* at 9-11. Officer Day then spoke with Barger, who was sitting on the sidewalk. According to Officer Day, Barger was somewhat quiet and when he spoke to Officer Day, Barger looked down and away. *Id.* at 13. While Barger was speaking and looking away, Officer

Day noticed the odor of alcohol coming from Barger. *Id.* at 14. The odor became stronger when Barger stood up. At that point, Officer Day noticed that Barger's eyes were glassy, bloodshot, and dilated. *Id.* at 15. When Officer Day asked Barger if he had consumed any alcoholic beverages that evening, Barger replied "no" in a "[v]ery stringent, very militarized type of stance, very stiff, very uncharacteristic of talking to somebody about, asking them normal questions." *Id.*

{¶ 18} Based on the credible testimony of Officer Day, along with the eyewitness account of Dana Combs, we conclude that the trial court did not err in finding that probable cause existed for Officer Day to arrest Barger. Therefore, the trial court did not err in overruling this branch of Barger's motion to suppress.

B. The State Showed Compliance with the Ohio Administrative Code in

Obtaining and Storing Barger's Blood Samples

{¶ 19} Barger next contends that the trial court erred in overruling his motion to suppress, because the State failed to show compliance with the requirements in Ohio Adm.Code 3701-53 relating to drawing and storing blood. In particular, Barger contends that the State failed to establish that (1) his blood sample was collected using an aqueous solution of a non-volatile antiseptic on the skin; (2) his blood was drawn with a sterile dry needle into a vacuum container with a solid anticoagulant; and (3) the blood samples were refrigerated at all times while not in transit or under examination.[1]

---

[1] It may be that the ruling on the motion to suppress with regard to the taking and storing of the blood samples is a moot issue. When evidence subject to a motion to suppress is not related to the eventual convicted charge, that motion to suppress issue is moot. *See State v. Gladman*, 2d Dist. Clark No. 2013 CA 99, 2014-Ohio-2554, ¶ 24 (Appellant was charged with OVI under both R.C. 4511.19(A)(1)(a) [impaired driving] and R.C.

{¶ 20} Ohio Adm.Code 3701-53-05(B) provides that "When collecting a blood sample, an aqueous solution of a non-volatile antiseptic shall be used on the skin. No alcohols shall be used as a skin antiseptic." Further, Ohio Adm.Code 3701-53-05(C) provides that "Blood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested."

{¶ 21} The State offered Abby Kaiser as an expert witness to establish compliance with these Administrative Code provisions. Barger contends that Ms. Kaiser lacked personal knowledge of the blood draw and therefore could not assist the State in establishing that proper protocol was followed. The trial court rejected this contention, stating that (Dkt. 57, p. 7):

The court had the opportunity to see the witness, Abby Kaiser. The court applies the tests of credibility to her testimony. The witness had the opportunity to see, hear and know the things about which she testified. The reasonableness of her testimony and her appearance on the stand is an indicator of credibility here. The entirety of her testimony indicates that she had personal knowledge about the encounter at Sycamore Hospital with Brent Barger. As she testified she recognized the tangible items she worked with and from seeing their contents she was able to recount what she did on June 26, 2014 at the Sycamore Hospital Emergency Center.

4511.19(A)(1)(d) [per se]. His no-contest plea to the (A)(1)(a) charge rendered moot any issues regarding suppression of the breathalyzer test because the test was not necessary or required to sustain the conviction on the impaired-driving charge.). However, the issue of mootness was not raised or briefed. Consequently, we decline to address potential mootness of the suppression ruling.

Simply because she is utilizing standard procedure, to some extent, does not make her testimony incredible. Standard procedure can actually enhance the likelihood of accurate testimonial, though alone it would not be sufficient.

{¶ 22} Ms. Kaiser testified that she used a sterile, dry needle to extract the blood samples from Barger. Tr. 176-177. The vials into which the blood was drawn contained a solid anticoagulant. *Id.* at 178. Ms. Kaiser used an iodine swab rather than alcohol swabs when drawing blood from Barger to prevent contamination. *Id.* at 187-188. Ms. Kaiser's testimony is sufficient to show compliance with Ohio Adm.Code 3701-53-05(B) and (C).

{¶ 23} Barger also contends that the State failed to meet its burden of showing compliance with Ohio Adm.Code 3701-53-05(F), which provides that "While not in transit or under examination, all blood and urine samples shall be refrigerated." According to Barger, the testimony of Officer Alex Flynn established that Barger's blood samples remained unrefrigerated for approximately 45 minutes while Flynn was entering the blood samples in the police department's system. Furthermore, Barger contends that the testimony of Elizabeth Kiely, forensic toxicologist for the Miami County Regional Crime Laboratory, raised the concern that the blood samples may have remained unrefrigerated for more than a total of five hours.

{¶ 24} In *State v. Baker*, 146 Ohio St.3d 456, 2016-Ohio-451, 58 N.E.3d 1114, ¶ 2-3, the Supreme Court held that a failure to refrigerate a blood sample for a period of up to five hours substantially complies with Ohio Adm.Code 3701-53-05(F). The testimony of record establishes that the storage of Barger's blood samples fell well within the *Baker*

standard. Specifically, Sargent Flynn testified that Barger's blood was drawn at approximately 1:05 A.M. The box containing the blood samples was then sealed and Flynn transported this box to the police department. Flynn logged the samples into the police department's evidence system and then placed them into the evidence refrigerator. Tr. 123-129. The blood samples were unrefrigerated from 1:07 A.M. until they were placed into the refrigerator at 2:09 A.M. *Id.* at 134. Later that morning, at 10:34 A.M., Flynn removed the blood samples from refrigeration and transported them to the crime lab. That trip lasted approximately 15 minutes. *Id.* In sum, Sargent Flynn's testimony establishes a total period of 77 minutes prior to arrival at the crime lab during which the blood samples were not refrigerated.

{¶ 25} Further, Elizabeth Kiely, a Forensic Toxicologist at the Miami Valley Regional Crime Lab, testified that the blood samples were refrigerated while at the crime lab, except during testing. *Id.* at 235, 238-240. Tests were conducted on the samples in July. *Id.* at 240-241, 245-247, 251. Ms. Kiely testified that there was a short period on August 22, 2014, when samples at the crime lab had to be moved from one refrigerator to another because the normal refrigerator was not working properly. The samples were likely moved after the second email arrived thirty minutes after the normal refrigerator stopped working properly. *Id.* at 270-276. Notably, all of the tests conducted on Barger's blood samples took place in July, a month before this short irregularity in the refrigeration process. *Id.* at 274.

{¶ 26} Based on the testimony of Sargent Flynn and Ms. Kiely, we conclude that the periods during which the blood samples were not refrigerated fell well within the allowable five hours established by *Baker*. Consequently, we conclude that the storage

of the blood samples substantially complied with Ohio Adm.Code 3701-53-05(F). Therefore, the trial court did not err in overruling this portion of Barger's motion to suppress.


### C. Barger's Blood Samples Were Not the Product of an Unreasonable Search and Seizure

{¶ 27} The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Barger contends that the State violated his right against unreasonable searches and seizures when Barger's blood was drawn outside of the three-hour period provided for in the search warrant.

{¶ 28} The search warrant provided, in part: "I find there is probable cause to command _____ and any other law enforcement officer with the assistance of a physician, registered nurse, or qualified technician, chemist or phlebotomist; to draw a blood sample from [Brent E. Barger] ; any time of day or night; as soon as possible (within 3 hours of operation of vehicle)."

{¶ 29} The trial court found that the blood draw executed approximately three and one-half hours after the accident occurred was not unreasonable in light of the fact that the "warrant itself has the language 'as soon as possible.' The police did not waste time here or act dilatorily. They had to investigate, prepare an affidavit, locate the judge, travel and obtain the necessary authorizations." Dkt. 74, p. 2.

{¶ 30} We agree with the trial court that the blood draw three and one-half hours after the fatal accident was not an unreasonable search under the Fourth Amendment to

the United States Constitution. Sargent Flynn testified regarding the execution of the search warrant to draw blood. Flynn received a call from the police dispatcher around 11:30 P.M. on the night of the accident. He was asked to prepare an affidavit to support the issuance of a search warrant. Flynn prepared the affidavit and contacted the municipal court judge to let him know that Flynn would be coming to the judge's house. Flynn drove directly to the judge's house and the judge signed the search warrant at 12:24 A.M. Flynn then drove directly to the hospital, located where Barger was, explained the search warrant to Barger, and then had the lab technician begin the process of drawing blood from Barger. The blood was drawn at 1:05 A.M. Tr. 62-74. There is no evidence of any undue delay or dilatory tactics by the police in obtaining or executing the search warrant.

{¶ 31} The affidavit for the search warrant states that the police responded to the crash involving Barger at 9:39 P.M. Three hours later would have been 12:39 A.M. The municipal court judge signed the search warrant at 12:24 A.M. Therefore, if the search warrant had to be executed within three hours of the accident, only 15 minutes remained to execute the warrant after the municipal judge signed it. Sargent Flynn testified that the drive from the judge's house to the hospital was approximately fifteen to twenty minutes. *Id.* at 74-75. In other words, if we were to read the warrant's language to strictly require execution of the warrant within three hours of the accident, rather than "as soon as possible" after the accident, complying with the terms of the warrant would have been virtually impossible at the time the municipal court judge signed it. Instead, we agree with the trial court that a reasonable reading of the search warrant is that the warrant had to be executed "as soon as possible" after the operation of the vehicle had

terminated.

{¶ 32} The inclusion of "(within 3 hours of operation of vehicle)" in the search warrant is likely a result of the current version of R.C. 4511.19(D)(1)(b), which provides for a three-hour time limit in which to draw blood from a person suspected of violating R.C 4511.19(A) or (B). Notably, in *State v. Hassler*, 115 Ohio St.3d 322, 2007-Ohio-4947, 875 N.E.2d 46, ¶ 2, the Supreme Court held that "a blood sample taken outside the time frame set out in R.C. 4511.19(D) is admissible to prove that a person was under the influence of alcohol as proscribed by R.C. 4511.19(A)(1)(a) in the prosecution for a violation of R.C. 2903.06, provided that the administrative requirements of R.C. 4511.19(D) are substantially complied with and expert testimony is offered." The trial court found that the administrative requirements were substantially complied with and expert testimony was offered. This finding is supported by the record.

{¶ 33} We conclude that the blood draw that occurred approximately three and one-half hours after the fatal accident was the product of a valid search warrant that was executed "as soon as possible" after the accident. Finally, we note that even if we had instead interpreted the search warrant to require the search to be made by 12:39 A.M., rather than as soon as possible after the accident, there is a line of federal cases that allow for searches made "shortly" after the expiration of a warrant if (1) the probable cause on which the warrant is based still exists at the time of the tardy search and (2) there is no showing of bad faith on the part of the government in executing the warrant shortly after the warrant expires. *See United States v. Richmond*, 694 F. Supp. 1310, 1311 (S.D. Ohio 1988) (holding that a search made 4.5 hours after a warrant expired was neither unreasonable nor constitutionally prejudicial to the defendant, because "there is

nothing in the record to indicate that the circumstances, related in the officer's affidavit affording probable cause for the issuance of the search warrant, changed before it was executed . . . ."); *United States v. Chambers*, S.D. Miss. No. 1:07cr15, 2007 WL 2872406, *1 (Sept. 27, 2007) (citing Tenth Circuit and Eleventh Circuit decisions that allowed searches completed shortly after the expiration of a search warrant if probable cause still exists and the government did not act in bad faith). The same probable cause that existed at 12:24 A.M. would have existed at 1:05 A.M. And the police officers in the present case did not engage in any bad faith or dilatory tactics, as evidenced by the testimony of record.

{¶ 34} Barger's sole assignment of error is overruled.

## III. Conclusion

{¶ 35} Appellant's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

HALL, P.J., concurs.

DONOVAN, J., concurring in part and dissenting in part:

{¶ 36} I disagree with the majority's analysis regarding the three-hour limitation set forth in the warrant for Barger's blood. The language "within 3 hours of operation of vehicle" is plain language which restricts the validity of the warrant. Hence, the warrant to withdraw blood from Barger expired by its very terms at 12:39 a.m. Although the warrant was executed promptly after issuance, law enforcement should not be permitted to extend the three-hour limit set forth in R.C. 4511.19(A)(1)(a) by waiting an hour after

Barger's arrest to initiate the process to secure a warrant. The record reflects this occurred here.

{¶ 37} I do not find the federal cases to be persuasive authority to allow admission of the test results, since the warrant was no longer valid, the search was unlawful. A search pursuant to a time sensitive warrant which has expired, is a warrantless search.

{¶ 38} First, *Richmond* involved a validly-issued search warrant, based on information from a confidential and reliable source, to search the defendant's premises. The warrant was obtained by state law enforcement officers from a Hamilton County Municipal Judge at 9:15 A.M. on Friday, February 19, 1988. The warrant was executed at 1:30 P.M. on Monday, February 22, 1988.

{¶ 39} The defendant challenged the validity of the execution of the warrant, arguing that Ohio Rule of Criminal Procedure 41(C) requires that a search warrant be executed within three days of its issuance. The search warrant in *Richmond* was executed four hours and fifteen minutes beyond the expiration of the three-day requirement.

{¶ 40} The court, in upholding the validity of the execution of the warrant, noted first that the Federal Rules of Criminal Procedure allow a 10–day statutory limit within which to execute a search warrant. Further, the court found that there was "nothing in the record to indicate that the circumstances, related in the officer's affidavit affording probable cause for the issuance of the search warrant, changed before it was executed." Based on the above, the court held that that the delay in the execution of the search warrant did not render the search unreasonable nor did it constitutionally prejudice the defendant.

{¶ 41} However, in this case, the warrant at issue was one authorizing the testing of Barger's blood-alcohol levels, as opposed to the search of one's premises, as in *Richmond*. The court in *Richmond* made no mention of any circumstances that would render the execution of the search warrant particularly time-sensitive. By contrast, the warrant here, which had the restriction of "within three hours of operation of vehicle," clearly considers the time sensitivity of testing the levels of alcohol in one's blood, especially as it relates to impairment and prohibited blood alcohol level while operating a motor vehicle at a past point in time. Finally, the time restriction argued by the defendant in *Richmond* was one that was set forth by state rules and federal criminal rules and statutes but not delineated in the warrant itself. Contrastingly, the restrictive time limit in this case was one specified on the warrant by the issuing judge, and was stated with apparent consideration of the particular circumstances at hand. Therefore, the circumstances in *Richmond* are distinguishable from Barger's case.

{¶ 42} *Chambers* too is distinguishable. *Chambers* challenged the validity of the execution of two search warrants beyond the time period specified on both warrants.

{¶ 43} On May 4, 2004, Chief Magistrate Judge Roper issued two search warrants in regard to the defendant, Charles D. Chambers. One was for Chambers's residence and the other was for his business, Chuck's Carpets. Agents were given information from a reliable informant that Chambers was maintaining two sets of accounting records for the purpose of tax evasion. One set of invoices, reported to the Internal Revenue Service, was kept at Chuck's Carpets, while another set, not reported, was kept at Chambers's residence. Agents sought to obtain these two sets of records. Both warrants issued by Judge Roper specified that the searches were to be conducted the

same day they were issued, "on or before May 4, 2004." However, law enforcement agents executed both on the morning of May 7, 2004.

{¶ 44} In upholding the validity of the execution of the warrants, the court in *Chambers* first noted that there had been "no showing that the delay was the result of intentional disregard of the warrant terms." However, in noting this factor, the court cites to *U.S. v. Sims*, 428 F.3d 945, 955 (10th Cir.2005), where the search warrants at issue were for the defendant's office and office computer, and the alleged delay in execution was one day after the date specified on the warrant, but was still within the federal statute's 10-day limit.

{¶ 45} The court in *Sims* emphasized the importance of the "intentional disregard of the warrant terms" factor based on the fact that "the Fourth Amendment does not require expiration dates," and thus "technical violations" of the Rules only result in exclusion under certain circumstances. The *Sims* court therefore concluded that exclusion simply based on the mandate of Fed.R.Crim.P. 41(e)(2)(A) requiring execution "within a specified time no longer than 10 days" would only apply in the event of executing officers' intentional disregard for the Rule, coupled with a showing that the probable cause was affected by the delay.

{¶ 46} The court in *Chambers* utilized the analysis provided in *Sims* because in both cases there were "technical" violations of the time limit provided in the Rules of Federal Criminal Procedure or the specified terms of the warrant where there was no evidence that the specified expiration terms considered the probable cause to be time sensitive. Therefore, the *Chambers* and *Sims* analyses of "technical" violations, which involve the two factors of "intentional disregard" and effect on probable cause, specifically

apply to situations where the time violations are based on the expiration of identified time limits that are provided without evidence of any consideration for the specific circumstances at hand. This conclusion is supported by both federal courts' addition of the second factor requiring a showing that the probable cause for the warrant was affected by the passage of time. The addition of this factor clearly indicates the *Sims* analysis applies to violations of expiration terms where the terms themselves were not specified with any consideration of the particular facts of the case. Thus, these analyses are distinguishable from the issue in this case, where the time restriction of the warrant on its face clearly contemplates the time sensitivity of the probable cause to withdraw Barger's blood.

{¶ 47} Furthermore, the officer who secured the warrant admitted that the issuing Judge advised him of the time limitation as evidenced by this exchange.

Q. Judge Rettich signed the warrant and he told you to get the blood as soon as possible within three hours of the operation of the vehicle. Correct?

A. Correct.

Q. And for reasons unknown, you weren't able to do that. Correct?

A. Correct.

Tr. 72-73.

{¶ 48} Accordingly, I would grant Barger's motion to suppress as it relates to the admissibility of the blood test results.

. . . . . . . . . .

Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Thomas Kollin
Hon. Timothy N. O'Connell