[Cite as *State v. Moore*, 2021-Ohio-1114.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28640 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-1292 |
| | : | |
| JOHNNIE LEE MOORE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of April, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by LISA M. LIGHT, Atty. Reg. No. 0097348, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 101 Southmoor Circle NW, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Johnnie Lee Moore, appeals from his conviction in the Montgomery County Court of Common Pleas of aggravated vehicular homicide. In support of his appeal, Moore contends that the trial court erred in failing to suppress evidence obtained from his blood sample that was taken pursuant to a search warrant. Moore claims that any evidence from the blood sample, i.e., the results of his blood-alcohol test, should have been suppressed because his blood was drawn beyond the three-hour time frame in R.C. 4511.19(D)(1)(b). Moore also argues that the blood draw violated his Fourth Amendment protection against unreasonable searches and seizures because it occurred outside the three-hour time frame set forth in the search warrant. For the reasons outlined below, we find that the trial court did not err in overruling Moore's motion to suppress. Therefore, the judgment of the trial court will be affirmed.

## Facts and Course of Proceedings

{¶ 2} On April 27, 2018, a Montgomery County grand jury returned an indictment charging Moore with two counts of aggravated vehicular homicide—one count in violation of R.C. 2903.06(A)(1)(a), a felony of the second degree, and the other count in violation of R.C. 2903.06(A)(2)(a), a felony of the third degree. The charges arose from allegations that on November 14, 2017, Moore was driving under the influence of alcohol when he caused an automobile accident that killed another driver.

{¶ 3} After pleading not guilty to the charges, on May 7, 2018, Moore moved to suppress all evidence obtained from a blood sample that was taken from him pursuant to a search warrant. Moore argued that the blood-sample evidence should be suppressed because the State could not establish that his blood was drawn and tested pursuant to

the requirements in R.C. 4511.19(D) and Chapter 3701-53 of the Ohio Administrative Code.

{¶ 4} On June 26, 2018, Moore filed a supplemental motion to suppress arguing three specific violations under R.C. 4511.19(D) and Ohio Adm.Code 3701-53. First, Moore argued that his blood sample was not drawn within three hours of the automobile accident as required by R.C. 4511.19(D)(1)(b). Second, Moore argued that his blood sample was not properly refrigerated as required by Ohio Adm.Code 3701-53-05(F). Third, Moore argued that the chain of custody for his blood sample was not maintained in compliance with Ohio Adm.Code 3701-53-06(A). Moore also argued that his Fourth Amendment protection against unreasonable searches and seizures was violated because his blood was not drawn within the three-hour time frame set out in the search warrant.

{¶ 5} The trial court held hearings on Moore's motion to suppress, during which it heard testimony from Officer Sherri Robinson and Sergeant Joseph McCrary of the Trotwood Police Department. The trial court also heard testimony from phlebotomist Shannon Kraus and forensic toxicologist Brian Simons of the Miami Valley Regional Crime Lab ("MVRCL"). During the hearing, the trial court admitted several exhibits, including a copy of the signed search warrant authorizing Moore's blood draw, a certificate from the Ohio Department of Health certifying that toxicologist Simons was qualified of to perform blood-alcohol testing, and an internal chain of custody report from MVRCL. Based on the testimony and evidence presented at the June 28th hearing, the trial court made the following findings of fact.

{¶ 6} At 7:14 p.m. on November 14, 2017, Officer Sherri Robinson was dispatched

to a motor vehicle accident at the intersection of Salem Avenue and Westbrook Road in the city of Trotwood, Montgomery County, Ohio. Upon arriving at the scene, Robinson observed that a Honda Civic had been struck in the northbound lane of Salem Avenue. In the southbound lane, Robinson observed a Ford vehicle in a position that trapped the driver inside the vehicle. Robinson also observed a Chevy vehicle in an embankment off the road. Robinson spoke to the driver of the Honda, who was unharmed. The driver of the Honda reported that the Chevy had struck her as she came to a stoplight at the intersection of Salem Avenue and Westbrook Road.

**{¶ 7}** While at the scene, Robinson observed medics attempting to treat the driver of the Ford, who died as a result of the accident. Robinson also observed medics attempting to extricate the driver of the Chevy, Moore, from his vehicle. After about 10 minutes, the medics successfully extricated Moore from the vehicle and placed him in an ambulance. During that time, Robinson observed that Moore was conscious, but in pain. Robinson then entered the ambulance to check on Moore's condition. Upon doing so, Robinson detected a moderate odor of alcohol emanating from Moore. When Robinson exited the ambulance she was approached by Moore's wife. Robinson asked Moore's wife where Moore was traveling from, and Moore's wife indicated that Moore was coming from a bar called Cognacs.

**{¶ 8}** Based on the accident, the odor of alcohol emanating from Moore, and the fact that Moore had been leaving a bar, Robinson suspected that Moore had been driving under the influence of alcohol. To investigate the matter further, Robinson followed Moore's ambulance to Miami Valley Hospital ("MVH") in order to seek Moore's consent for a blood sample. Robinson arrived at MVH at 7:51 p.m.

**{¶ 9}** Upon arriving at MVH, Robinson was told by hospital staff that she could speak with Moore after he received CAT scans and emergency medical treatment. Robinson waited outside Moore's hospital room until a staff member advised her that Moore had been sedated after his CAT scans due to his being uncooperative. Thereafter, at 9:34 p.m., Robinson called Sergeant Joseph McCrary and advised him of the situation. Robinson told McCrary that a search warrant would be needed in order to obtain a blood sample from Moore.

**{¶ 10}** After receiving Robinson's call, McCrary drove to the Trotwood Police Department to prepare a search warrant. Once he arrived at the police department, McCrary called his fellow officers, Sergeant DeLong and Officer Richardson, to obtain information necessary to prepare the warrant. Neither DeLong nor Richardson answered their phone, so McCrary left messages for them to return his call. While awaiting their calls, McCrary began preparing the search warrant "the old fashioned way" by typing out the warrant and affidavit. Around 10:30 p.m., DeLong returned McCrary's call and provided him with the necessary information to complete the search warrant. DeLong also told McCrary that he could prepare the warrant using a preprinted "short form" and told him where to find it. McCrary thereafter found the short form and completed the search warrant.

**{¶ 11}** After completing the search warrant, McCrary attempted to find a judge to review and sign it. McCrary contacted the first judge on his list and waited for a return call. When the judge returned McCrary's call, the judge informed McCrary that he was retired and could not help. McCrary then contacted Judge Deirdre Logan of the Dayton Municipal Court, who told McCrary to bring the warrant to her residence. McCrary

arrived at Judge Logan's residence at 11:40 p.m. Judge Logan signed the warrant at 11:46 p.m. The search warrant stated, in pertinent part, the following:

> Affiant, Joseph A. McCrary, personally appeared before me and swore to facts set forth in an affidavit from which I find there is probable cause to command Joseph A. McCrary and any other law enforcement officer with the assistance of a physician, registered nurse, or qualified technician, chemist or phlebotomist; to draw a blood sample from Johnnie L. Moore as described in the above affidavit and seized or located within this court's jurisdiction; any time day or night; as soon as possible (within 3 hours of operation of vehicle).

State's Exhibit 2.

{¶ 12} Upon receiving the signed search warrant, McCrary left Judge Logan's residence and drove to MVH. On the way to MVH, McCrary called Robinson and told her to inform Moore's medical staff that there was a search warrant to obtain Moore's blood sample. At 12:05 a.m., McCrary arrived at MVH and presented the search warrant to Robinson. Robinson then entered Moore's hospital room and presented the warrant to phlebotomist Shannon Kraus. Kraus verified that the warrant was signed and that Moore was the person named in the warrant. Kraus then used a standard DUI kit to obtain Moore's blood sample.

{¶ 13} When obtaining the blood sample, Kraus broke the seal of the DUI kit and inventoried the contents of the kit. Kraus then used a tourniquet to find a suitable vein on Moore's left arm and swabbed the area with Betadine, a non-alcohol antiseptic. Kraus thereafter prepared her instruments by screwing a straight needle onto a hub.

Kraus then retied the tourniquet, punctured Moore's vein with the needle, and placed a vacuum tube on the hub. When the vacuum expired, Kraus removed the tube and placed a second vacuum on the hub. When the second vacuum expired, Kraus removed the tourniquet, tube, and needle. Kraus then inverted the tubes five to six times to mix the blood with the powder anticoagulant in the tubes.

{¶ 14} At 12:08 a.m., Kraus bubble-wrapped and placed labels over the tops of the tubes containing Moore's blood. The labels included Robinson's name, Moore's name, Kraus's name, and the date and time. After placing the tubes in the DUI kit, Kraus closed, sealed, and labeled the kit. Kraus then gave the kit to Robinson.

{¶ 15} Upon receiving the sealed DUI kit, Robinson and McCrary left Moore's hospital room and briefly spoke with Moore's wife. The officers then spoke with each other for approximately 15 to 20 minutes. Following their conversation, Robinson returned to her cruiser and transported the DUI kit to the Trotwood Police Department. Robinson arrived at the police department at 1:20 a.m. Robinson completed her report and lab sheet before placing the DUI kit in the department's refrigerator. At 1:46 a.m., Robinson finished the necessary paperwork and placed the DUI kit in a locked compartment of the police department's refrigerator.

{¶ 16} Later that day, the sealed DUI kit was delivered to MVRCL where it was assigned a bar code and placed in a secure refrigerator. Forensic toxicologist Elizabeth Kiely retrieved the kit and transferred it to MVRCL's toxicology section. Kiely inspected the DUI kit to ensure it was properly labeled and sealed. Kiely then broke the seal, opened the kit, and inventoried its contents. Kiely thereafter placed the kit in a secure refrigerator to await analysis.

{¶ 17} On November 21, 2017, forensic toxicologist Brian Simons retrieved the DUI kit from MVRCL's secure refrigerator and preformed an initial screen of Moore's blood sample using an approved testing method. The initial screen was positive for ethanol at a concentration of .114, plus or minus .011 gram per cent. One week later, on November 28, 2017, Simons used another approved testing method to perform a confirmation analysis. The confirmation analysis was positive for ethanol at a concentration of .117, plus or minus .011 gram per cent. All of the data, including Simons's data, was reviewed and used by forensic toxicologist Kialee Bowles to author a report. Pursuant to MVRCL's policy, the lower concentration of .114, plus or minus .011 gram per cent, was reported.

{¶ 18} On April 10, 2019, the trial court issued a judgment overruling Moore's motion to suppress the blood-sample evidence. In so holding, the trial court found that the approximate five-hour delay in taking Moore's blood sample did not require suppression of the blood-alcohol test results. The trial court also found that there was substantial compliance with the refrigeration requirement in Ohio Adm.Code 3701-53-05(F). The trial court further found that MVRCL substantially complied with the chain of custody requirements in Ohio Adm.Code 3701-53-06(A). The trial court additionally noted that any breaks in the chain of custody went to the weight of the evidence, not its admissibility.

{¶ 19} With regard to the search warrant, which required Moore's blood to be drawn "as soon as possible (within 3 hours of operation of vehicle)," the trial court relied on this court's holding in *State v. Barger*, 2017-Ohio-4008, 91 N.E.3d 277 (2d Dist.), and found that Moore's blood sample was the product of a valid search warrant that was

executed as soon as possible after the accident.

{¶ 20} After the trial court overruled Moore's motion to suppress, the matter proceeded to a jury trial. Following trial, the jury found Moore guilty of both counts of aggravated vehicular homicide. At sentencing, the trial court merged the counts and imposed a mandatory term of eight years in prison. The trial court also ordered Moore to pay $4,337.04 in restitution and placed a lifetime suspension on his driver's license.

{¶ 21} Moore now appeals from his conviction and raises a single assignment of error for review.

**Assignment of Error**

{¶ 22} Under his sole assignment of error, Moore argues that the trial court erred in failing to suppress the evidence obtained from his blood sample, i.e., the results of his blood-alcohol test. In support of this claim, Moore asserts that his blood sample was not taken within the time frame set out in the search warrant and in R.C. 4511.19(D)(1)(b). In light of this failure, Moore argues that the search warrant was illegally executed and that the blood draw violated his Fourth Amendment protection against unreasonable searches and seizures. We disagree.

*Standard of Review*

{¶ 23} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." (Citation omitted.) *State v. Burnside,* 100 Ohio St.3d 152,

2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Citation omitted.) *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." (Citation omitted.) *Id.*

### *R.C. 4511.19(D)(1)(b)*

**{¶ 24}** As previously noted, Moore contends that all evidence obtained from his blood sample should be suppressed because it was not taken within the time frame set out in the search warrant and in R.C. 4511.19(D)(1)(b). For purposes of clarity, we will first address R.C. 4511.19(D)(1)(b), which provides as follows:

> [T]he court may admit evidence on the concentration of alcohol, drugs of abuse, controlled substances, metabolites of a controlled substance, or a combination of them in the defendant's whole blood, blood serum or plasma, breath, urine, or other bodily substance at the time of the alleged violation as shown by chemical analysis of the substance ***withdrawn within three hours of the time of the alleged violation.*** * * *

(Emphasis added.)

**{¶ 25}** There is no dispute that Moore's blood was not drawn within three hours of the automobile accident at issue. The automobile accident occurred around 7:14 p.m. on November 14, 2017, and Moore's blood was drawn at 12:08 a.m. the following morning. Therefore, Moore's blood was drawn approximately five hours after the alleged violation.

{¶ 26} The Supreme Court of Ohio has held that "[a] blood sample taken outside the time frame set out in R.C. 4511.19(D) is admissible to prove that a person was under the influence of alcohol as proscribed by R.C. 4511.19(A)(1)(a) in the prosecution for a violation of R.C. 2903.06 [aggravated vehicular homicide], provided that the administrative requirements of R.C. 4511.19(D) are substantially complied with and expert testimony is offered."  *State v. Hassler*, 115 Ohio St.3d 322, 2007-Ohio-4947, 875 N.E.2d 46, syllabus.

{¶ 27} The administrative requirements in R.C. 4511.19(D) provide that "only a physician, a registered nurse, an emergency medical technician-intermediate, an emergency medical technician-paramedic, or a qualified technician, chemist, or phlebotomist shall withdraw a blood sample[.]"  R.C. 4511.19(D)(1)(b).  The administrative requirements also provide that "the bodily substance withdrawn * * * shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code."  *Id.*  Pursuant to R.C. 3701.143, the Ohio Director of Health has promulgated regulations governing the collection, handling, and analysis of bodily substances, which are set forth in Ohio Adm.Code Chapter 3701-53.  *State v. Owens*, 6th Dist. Lucas No. L-15-1215, 2016-Ohio-3092, ¶ 16; *State v. Waldock*, 2015-Ohio-1079, 33 N.E.3d 505, ¶ 51 (3d Dist.).

{¶ 28} In his motion to suppress, Moore claimed that the State could not establish that Moore's blood sample was collected and analyzed in substantial compliance with the regulations in Ohio Adm.Code 3701-53-05(F) and 3701-53-06(A).  The former regulation requires blood specimens to be refrigerated while not in transit or under examination.

The latter regulation requires the testing laboratory to identify and retain a chain of custody for not less than three years.

{¶ 29} With regard to the refrigeration requirement, Moore's blood sample was not refrigerated until 1 hour and 38 minutes after it was drawn. The blood sample was drawn at 12:08 a.m. at MVH and then taken to the Trotwood Police Department by Officer Robinson, who placed the blood sample in the police department's refrigerator at 1:46 a.m. In his motion, Moore took issue with Robinson's delay in transporting his blood sample to the police station and with Robinson finishing her paperwork as opposed to immediately refrigerating his blood sample when she arrived at the police station at 1:20 a.m.

{¶ 30} In *State v. Baker*, 146 Ohio St.3d 456, 2016-Ohio-451, 58 N.E.3d 1114, the Supreme Court of Ohio held that "[w]hile strict compliance with the [refrigeration] regulation is preferable, we recognize inherent logistical issues that may make strict compliance unrealistic." *Id*. at ¶ 21. More specifically, the court held "that failing to refrigerate a blood specimen for a period of four hours and ten minutes before placing it in transit for analysis is a de minimis error and does not render the test result inadmissible for failure to substantially comply with Ohio Adm.Code 3701-53-05(F)." *Id*. In so holding, the court noted that it had "previously held that the failure to refrigerate a sample for a period of up to five hours substantially complied with the administrative regulation." *Id*. at ¶ 2 and ¶ 19, citing *State v. Plummer*, 22 Ohio St.3d 292, 490 N.E.2d 902 (1986), and *State v. Mayl*, 106 Ohio St.3d 207, 2005-Ohio-4629, 833 N.E.2d 1216.

{¶ 31} In *Barger*, 2017-Ohio-4008, 91 N.E.3d 277, this court was presented with a case where blood samples remained unrefrigerated for approximately 45 minutes while

an officer was entering the blood samples into the police department's system. *Id*. at ¶ 23. Despite this delay, we found that "the periods during which the blood samples were not refrigerated fell well within the allowable five hours established by *Baker*." *Id*. at ¶ 26. Consequently, we concluded "that the storage of the blood samples substantially complied with Ohio Adm.Code 3701-53-05(F). *Id*. *See also State v. Moore*, 6th Dist. Wood No. WD-18-030, 2019-Ohio-3705, ¶ 77 (finding substantial compliance with Ohio Adm.Code 3701-53-05(F) even though the blood sample in question was not always refrigerated while not in transit or under examination).

{¶ 32} In light of the holdings in *Baker*, *Barger*, and *Moore*, we find that the 1 hour and 38 minute delay in refrigerating Moore's blood sample did not prevent a finding of substantial compliance with the refrigeration requirement in Ohio Adm.Code 3701-53-05(F).

{¶ 33} With regard to the chain of custody requirement, forensic toxicologist Simons testified that MVRCL maintained an internal chain of custody for Moore's blood sample and that it was MVRCL's practice to retain the chain of custody for a minimum of three years. The actual chain of custody kept by MVRCL was also admitted into evidence as Defendant's Exhibit A. Therefore, we agree with the trial court's conclusion that substantial compliance with Ohio Adm.Code 3701-53-06(A) was established. In so holding we note that any alleged breaks in the chain of custody prior to it reaching MVRCL would go to the weight of the evidence, not its admissibility. *State v. Ramos*, 2d Dist. Montgomery No. 28214, 2019-Ohio-3588, ¶ 25.

{¶ 34} Because the evidence established substantial compliance with the administrative requirements of R.C. 4511.19(D), and because the State offered expert

testimony regarding the collection and analysis of Moore's blood sample, pursuant to *Hassler*, we find that even though Moore's blood sample was taken outside the three-hour time frame in R.C. 4511.19(D)(1)(b), the sample was nevertheless admissible to prove that Moore was under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a) for purposes of prosecuting him for aggravated vehicular homicide.

*Search Warrant*

{¶ 35} We now turn to Moore's argument that the blood draw in question constituted an unreasonable search and seizure since it was not performed within the time frame set out in the search warrant. The language of the search warrant authorized law enforcement to obtain Moore's blood sample "as soon as possible (within 3 hours of operation of vehicle)." State's Exhibit 2. Because the blood sample was taken approximately five hours after Moore operated his vehicle, Moore contends that the search warrant was invalid and illegally executed. We disagree.

{¶ 36} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures." *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15. "A search conducted pursuant to an invalid warrant is the equivalent of a warrantless search, which is per se unreasonable and therefore illegal." *State v. Richardson*, 2d Dist. Greene No. 08CA0077, 2009-Ohio-6018, ¶ 10, citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). "The fruits of an illegal search are subject to suppression by the court in which criminal charges arising from the search and seizure are filed." *Id*.

{¶ 37} In *Barger*, 2017-Ohio-4008, 91 N.E.3d 277, this court addressed the exact

same Fourth Amendment issue raised herein by Moore. The defendant in *Barger* was charged with operating a motor vehicle while under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a) and aggravated vehicular homicide in violation of R.C. 2903.06(A)(2). *Id.* at ¶ 9. Like the present case, the defendant's blood sample was obtained pursuant to a search warrant that authorized law enforcement to draw the defendant's blood "as soon as possible (within 3 hours of operation of vehicle)." *Id.* at ¶ 28. The defendant's blood sample, however, was drawn 30 minutes beyond the time frame stated in the search warrant. *Id.* at ¶ 29.

{¶ 38} Even though the blood sample in *Barger* was drawn beyond the three-hour time frame in the search warrant, we held that the blood draw was not an unreasonable search and seizure under the Fourth Amendment. *Id.* at ¶ 30. In so holding, we considered that there was "no evidence of any undue delay or dilatory tactics by the police in obtaining or executing the search warrant." *Id.* We also held that "a reasonable reading of the search warrant is that the warrant had to be executed 'as soon as possible' after the operation of the vehicle had terminated." *Id.* at ¶ 31. We explained that had we "read the warrant's language to strictly require execution of the warrant within three hours of the accident, rather than 'as soon as possible' after the accident, complying with the terms of the warrant would have been virtually impossible at the time the municipal court judge signed it." *Id.*

{¶ 39} We further held that "[t]he inclusion of '(within 3 hours of operation of vehicle)' in the search warrant is likely a result of the current version of R.C. 4511.19(D)(1)(b)," which, as previously discussed, provides a three-hour time frame to draw blood from a person suspected of violating R.C. 4511.19(A)(1)(a). *Id.* at ¶ 32. We

then considered the Supreme Court of Ohio's decision in *Hassler*, 115 Ohio St.3d 322, 2007-Ohio-4947, 875 N.E.2d 46, which, as previously noted, held that a blood sample taken outside the three-hour time frame is admissible provided that the administrative requirements of R.C. 4511.19(D) are substantially complied with and expert testimony is offered. *Barger* at ¶ 32, citing *Hassler* at ¶ 2. Thereafter, we noted that the trial court found that the administrative requirements of R.C. 4511.19(D) were substantially complied with and that expert testimony was offered. *Id.* Accordingly, our decision in *Barger* indicates that *Hassler* supports the conclusion that the failure to meet the three-hour time frame in the search warrant does not require suppression of the blood-sample evidence as long as there is substantial compliance with the necessary administrative requirements and expert testimony is offered.

{¶ 40} Lastly, in *Barger* we recognized that:

[T]here is a line of federal cases that allow for searches made "shortly" after the expiration of a warrant if (1) the probable cause on which the warrant is based still exists at the time of the tardy search and (2) there is no showing of bad faith on the part of the government in executing the warrant shortly after the warrant expires. *See United States v. Richmond*, 694 F.Supp. 1310, 1311 (S.D. Ohio 1988) (holding that a search made 4.5 hours after a warrant expired was neither unreasonable nor constitutionally prejudicial to the defendant, because "there is nothing in the record to indicate that the circumstances, related in the officer's affidavit affording probable cause for the issuance of the search warrant, changed before it was executed ...."); *United States v. Chambers*, S.D. Miss. No. 1:07cr15,

2007 WL 2872406, *1 (Sept. 27, 2007) (citing Tenth Circuit and Eleventh Circuit decisions that allowed searches completed shortly after the expiration of a search warrant if probable cause still exists and the government did not act in bad faith).

*Barger*, 2017-Ohio-4008, 91 N.E.3d 277, at ¶ 33.

**{¶ 41}** In following *Barger*, we find that a reasonable reading of the search warrant herein is that the warrant had to be executed "as soon as possible" after the automobile accident in question. Based on the trial court's findings of fact, which are supported by competent credible evidence, we find that even though Moore's blood was drawn approximately five hours after the accident, it was nevertheless drawn as soon as possible.

**{¶ 42}** Like *Barger*, there was no evidence of bad faith, undue delay, or dilatory tactics by law enforcement in executing the search warrant. The trial court's findings of fact establish that Officer Robinson was diligent in her initial effort to obtain Moore's consent to provide a blood sample when she followed Moore to the hospital. However, after waiting approximately 90 minutes in the emergency room, Robinson ultimately had to request a search warrant when she learned that Moore had to be sedated due to being uncooperative. After learning this information, Robinson contacted Sergeant McCrary and requested a search warrant. McCrary then acted diligently on the request by driving to the police department and contacting other officers in order to obtain the information necessary to prepare the search warrant.

**{¶ 43}** After obtaining the necessary information and preparing the warrant, McCrary consulted a list of judges and called two judges before finding one who was

available to sign the warrant. McCrary then drove to the judge's residence and had the warrant signed at 11:46 p.m. At 12:05 a.m., McCrary arrived at the hospital and presented the signed warrant to Robinson. Robinson then presented the warrant to the phlebotomist who drew Moore's blood at 12:08 a.m. Based on these facts and circumstances, we find no evidence of any bad faith, undue delay, or dilatory tactics in executing the search warrant and note that the same probable cause that existed within three hours of the accident would have existed when Moore's blood was drawn at 12:08 a.m. *See Barger,* 2017-Ohio-4008, 91 N.E.3d 277, at ¶ 33.

{¶ 44} We also note that strict compliance with the three-hour time frame in the search warrant would have made it impossible to execute the warrant since the warrant was signed by Judge Logan approximately four and a half hours after the automobile accident. Also, like in *Barger,* the trial court found that the administrative requirements in R.C. 4511.19(D) were substantially complied with and that expert testimony was offered. Given the holding in *Hassler,* 115 Ohio St.3d 322, 2007-Ohio-4947, 875 N.E.2d 46, this serves as additional support for finding that Moore's blood sample was admissible despite it being drawn outside the three-hour time frame in the search warrant. *See Barger* at ¶ 32.

{¶ 45} In light of the foregoing, we find that the search warrant in this case was validly executed and that Moore's blood draw did not violate his Fourth Amendment protection against unreasonable searches and seizures.

{¶ 46} Moore's sole assignment of error is overruled.

**Conclusion**

{¶ 47} Having overruled Moore's assignment of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Lisa M. Light
Jeffrey T. Gramza
Hon. Steven K. Dankof