[Cite as *State v. Weaver*, 2024-Ohio-5028.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 30145 |
| | : | |
| v. | : | Trial Court Case No. 2023-TRC-757 |
| | : | |
| WILLIE WEAVER | : | (Criminal Appeal from Municipal Court) |
| | : | |
| Appellee | : | |
| | : | |

· · · · · · · · · · ·

O P I N I O N

Rendered on October 18, 2024

· · · · · · · · · · ·

ASHLEY THOMAS, Attorney for Appellant

ARVIN S. MILLER, Attorney for Appellee

· · · · · · · · · · · ·

LEWIS, J.

{¶ 1} Pursuant to R.C. 2945.67(A) and Crim.R. 12(K), Appellant State of Ohio appeals from the judgment of the Dayton Municipal Court granting Defendant-Appellee Willie Weaver's motion to suppress evidence obtained following a traffic stop. For the

following reasons, the judgment of the trial court will be reversed, and the case will be remanded to the trial court for further proceedings consistent with this opinion.

## I.    Procedural History and Facts

{¶ 2} Following a February 4, 2023 traffic stop, Willie Weaver was charged with one count of operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them ("OVI"), in violation of R.C. 4511.19(A)(1)(a), a misdemeanor of the first degree; two counts of driving under a nonpayment of judgment suspension, in violation of R.C. 4510.16(B), misdemeanors of the fourth degree; one count of crossing marked lanes, in violation of R.C. 4511.33, a minor misdemeanor; and one count of operating a vehicle under the influence of marijuana metabolite of at least 35 nanograms of marijuana per milliliter of urine, in violation of R.C. 4511.19(A)(1)(j)(viii)(II), a misdemeanor of the first degree.

{¶ 3} On April 11, 2023, Weaver filed a motion to suppress the results of his urinalysis and field sobriety testing, his statements, and the observations and opinions of the arresting police officer.   Weaver argued that: 1) the police officer had lacked reasonable, articulable suspicion to conduct the initial seizure; 2) the officers had not had reasonable, articulable suspicion that he was under the influence of alcohol and/or drugs of abuse in order to require him to complete field sobriety tests; 3) the field sobriety tests had not been administered in strict compliance with the U.S. Department of Transportation National Highway Traffic Safety Administration ("NHTSA") procedures; 4) Weaver's statements had been made in violation of *Miranda v. Arizona*, 384 U.S. 436 (1969); 5) Weaver's consent to the urine screen had been involuntary; 6) the testing had

not been conducted in an accurate and reliable manner; 7) the laboratory had failed to comply with R.C. 4511.19 and the administrative regulations for testing; and 8) R.C. 4511.19(A)(1)(j)(viii)(II) was unconstitutional. He filed supplemental motion to suppress on June 20, 2023, which attempted to correct the applicable administrative code sections.

{¶ 4} Hearings were held on July 24 and August 22, 2023. Before the start of the July 24, 2023 hearing, defense counsel was asked to place on the record the issues raised by the motion to suppress. Counsel stated that the defense was challenging "just the stop, the administration of the field tests, the collection of the urine sample, and the testing of the urine sample." Tr. 5. The State then introduced the testimony of Officer Matthew Lykins and two laboratory employees, Elizabeth Walker-Valle, and Kialee Daniel.

{¶ 5} Officer Lykins testified that he was employed by the City of Dayton and the Department of Aviation. He had worked as an airport police officer for 21 years and received extensive training in the detection of impaired drivers. Officer Lykins became a standardized field sobriety test instructor in 2012, completed ARIDE (Advanced Roadside Impaired Driving Enforcement) training in 2013, and was certified in 2015 as a drug recognition expert in the State of Ohio, which was recognized nationally. Officer Lykins testified that he received regular updates on his training and took proficiency tests every two years to maintain his certification.

{¶ 6} Officer Lykins testified that on February 4, 2023, a sunny Saturday afternoon, he was on duty wearing the uniform of the day and driving a marked patrol car. Around 1 p.m., Officer Lykins conducted a traffic stop on Weaver, who was leaving the Dayton

airport short-term parking lot. Weaver turned out of the lot driving the wrong way on a one-way road. Weaver then made a U-turn in the middle of the road and headed back toward Officer Lykins. Officer Lykins pulled behind Weaver and observed Weaver's car accelerate to about 40 miles per hour ("mph") in a 25 mph speed zone. Although Officer Lykins did not use a laser or radar gun to calculate Weaver's speed, he paced Weaver's car for approximately one-half mile using his speedometer to calculate the 40 mph speed. Lykins had previously received training to conduct pacing at the police academy. At that point, Officer Lykins turned on his overhead lights.

{¶ 7} Weaver was in the left lane of a two-lane road at the time Officer Lykins turned on his overhead lights. Weaver abruptly stopped partially in the road on the left shoulder. As Officer Lykins approached Weaver's vehicle, he observed Weaver light up a cigarette. Officer Lykins had learned from his training that the lighting of a cigarette as an officer approaches a car is often done to cover up an odor. When Officer Lykins spoke to Weaver at the car, he only smelled the odor of cigarettes.

{¶ 8} A female passenger was in the vehicle with Weaver, and they explained that they had come to the airport to try to rent a vehicle. Weaver apologized for going the wrong way and claimed he was not familiar with the airport. Weaver had droopy eyelids, and his eyes appeared to be bloodshot. When Officer Lykins asked for Weaver's license and registration, Weaver said he must have forgotten his license and wallet at home. Weaver further claimed that the vehicle he was driving belonged to his mother-in-law and that he was not sure where the insurance card and registration were located.

{¶ 9} Because Weaver did not have identification with him, Officer Lykins

requested his social security number, name, and date of birth. A computer LEADS records check revealed that Weaver had multiple open suspensions. Therefore, Officer Lykins asked Weaver to accompany him to his cruiser and sit in the rear of the vehicle while he answered more questions, such as his address, and was issued a citation. Weaver was not handcuffed while in the back seat.

{¶ 10} During their conversation, Officer Lykins detected the odor of burnt marijuana coming from inside his vehicle. Officer Lykins had not smelled an odor of marijuana in his vehicle before Weaver sat there, and he had not had any marijuana in his vehicle or had any stops earlier that day involving someone with marijuana. Officer Lykins testified that he recognized the odor of marijuana based on his training and experience and identified the smell as burnt marijuana as opposed to raw marijuana.

{¶ 11} Officer Lykins asked Weaver if he had been around any marijuana or had smoked marijuana that day. Weaver readily admitted that he had smoked marijuana about six hours prior to the stop. Officer Lykins asked Weaver how often he smoked; Weaver replied that he was Jamaican and, in a laughing tone, stated it was part of his culture that he smoked daily.

{¶ 12} Following Weaver's admissions, Officer Lykins had Weaver get out of the vehicle and perform standardized and non-standardized field sobriety tests. Officer Lykins first had Weaver perform the "Alphabet Test," which consisted of starting at a letter other than "A" and stopping at a letter other than "Z." In this case, Officer Lykins asked Weaver to start with the letter "E" and stop at the letter "U." Before doing the test, Weaver stated that he understood the alphabet and the instructions. Weaver missed the letter

"P" and then went all the way to the letter "Z."

{¶ 13} The second test Officer Lykins had Weaver perform was the numbered test. Officer Lykins instructed Weaver to count down from 83 to 57. Before starting the test, Weaver indicated he could count from 1 to 100 and that he understood the test and would complete it. Weaver skipped the number 70 and stopped at 50. Both the alphabet test and the numbered test are non-standardized field sobriety tests but are identified in the NHTSA manual as useful for obtaining evidence of impairment.

{¶ 14} Prior to conducting the standardized field sobriety tests ("SFSTs"), Officer Lykins confirmed with Weaver that he did not have any physical injuries, medical history, or medication history that could interfere with any of the tests. Officer Lykins then performed the horizontal gaze nystagmus test ("HGN"). Weaver did not exhibit any clues and did not show any vertical nystagmus.

{¶ 15} Officer Lykins then conducted an additional non-standardized field sobriety test called a lack of convergence test, which was conducted on Weaver in the same positioning as the HGN test. The purpose was to determine whether the subject's eyes crossed when the officer brought the stimulus toward the bridge of the subject's nose. Normally, the eyes will cross as the stimulus approaches the bridge of the nose. The lack of convergence, when either one or both of the eyes fail to cross, is picked up in four of the seven drug categories: disassociate anesthetic, the CNS depressant, inhalants, and cannabis. The HGN test, on the other hand, tests for the same drug categories as the lack of convergence test minus cannabis. Officer Lykins testified that marijuana is in the cannabis drug category. When Officer Lykins conducted the lack of convergence

test, neither of Weaver's eyes converged.

{¶ 16} The second SFST conducted was the walk-and-turn. While being advised of the instructions before the test began, Weaver's feet broke apart twice and he stepped off the line where he was told to stand. During the test, which Weaver stated he understood, Weaver raised his arms, stepped off the line multiple times, missed going heel to toe several times, and paused for greater than five seconds before asking which way to turn. In total, Weaver exhibited five out of the eight clues for the walk-and-turn test. Officer Lykins testified that as few as two clues indicate impairment for that test.

{¶ 17} The final SFST conducted was the one-leg stand. After being informed of the instructions, which Weaver indicated he understood, he swayed and raised his arms higher than instructed. He also stopped counting before he was told to stop. In total, Weaver exhibited two out of four clues in the one-leg stand test.

{¶ 18} Officer Lykins testified that the SFSTs were originally designed to detect alcohol impairment. He further testified that he had administered the SFSTs in accordance with the NHTSA guidelines. After completing the final standardized field sobriety test, Weaver was placed in handcuffs and arrested. Weaver was advised of his *Miranda* rights, patted down, and placed in the rear of the cruiser. At the police department, Weaver was read the BMV 2255 form. Weaver consented to provide a urine specimen, which was collected and marked as evidence.

{¶ 19} The urine specimen was collected using a collection kit provided by the Miami Valley Regional Crime Laboratory. The envelope containing the collection kit was was sealed prior to Officer Lykins opening it. The collection kit contained a plastic zip

lock bag, latex gloves, a test tube-type container to hold liquid, and a label to place on the tube that specified the citation number, subject's name, date and time collected, and the witness who observed the collection. The container was clean prior to Weaver's submitting a urine specimen, and Officer Lykins wore gloves when collecting the specimen from Weaver. Officer Lykins placed the tube containing the urine specimen inside a plastic bag to prevent any spillage, then sealed the plastic bag and placed the plastic bag inside the manila envelope, which was then sealed with clear tape. Officer Lykins initialed both sides of the tape and dated it. The specimen was collected at 2:10 p.m. on February 4, 2023, and the manila envelope containing the specimen was placed in a locked OVI evidence refrigerator until it could be transported to the lab. Officer Lykins testified that the refrigerator was working properly.

{¶ 20} Elizabeth Walker-Valle, a forensic toxicology technician with the Montgomery County Coroner's Office and Miami Valley Regional Crime Lab, testified that she retrieved the manila envelope containing Weaver's urine specimen from the property room refrigerator and to the chain of custody of the specimen while it was at the lab. A printout from the Miami Valley Regional Crime Laboratory regarding the chain of custody for Weaver's urine specimen was submitted at the hearing and discussed by Walker-Valle. The chain of custody report documented the manila envelope containing the urine specimen was received from B. McHargue on February 9, 2023, and given to Cody Miller, an individual who worked in the front office at the lab, who then placed the envelope in the lab's property room refrigerator. From the refrigerator, the envelope was provided to Walker-Valle, who documented the specimen with photos and itemized the evidence

inside the envelope. She testified that she did not observe a seal on the test tube-type container. Because there was no seal observed on the tube itself, Walker-Valle stated, "I can't say whether or not something had happened to that tube prior to our (inaudible.)" Walker-Valle testified that typically they do see seals on the test tube container itself, which is done to prevent tampering. However, when she received the test tube container, it was closed inside the external envelope, which was closed and sealed. She did not observe the test tube container leaking, and the external envelope was neither leaking nor wet.

{¶ 21} Kialee Daniel, a forensic toxicologist at the Montgomery County Coroner's Office and Miami Valley Regional Crime Laboratory, testified to the testing of the urine specimen and the chain of custody of the specimen at the laboratory. Daniel testified that another forensic toxicologist who used to work in their department had conducted the initial volatile screen testing on Weaver's urine specimen, but she passed away in February 2024 after performing the analysis. The targeted screen results, conducted by forensic toxicologist Treena Redmon, tested positive for THC metabolite and privoxy metabolite. A confirmation test verified the presence of 11-carboxy-delta-9-THC, a marijuana metabolite that is illegal in the State of Ohio, in a concentration of more than 100 nanograms per milliliter. Daniel testified that all the testing was done in accordance with the Ohio Administrative Code, such as calibration checks and certifications.

{¶ 22} Pursuant to the State's request, the trial court took judicial notice of the 2023 NHTSA manual.

{¶ 23} On August 22, 2023, the State presented two additional witnesses at the

motion to suppress hearing: Dayton Airport Police Officer Brian McHargue and Miami Valley Regional Crime Laboratory forensic toxicologist Treena Redmon. Officer McHargue testified that on February 9, 2024, he had retrieved the manila envelope containing Weaver's urine specimen from the locked Dayton Airport evidence refrigerator and transported it to the Miami Valley Regional Crime Laboratory. Although Officer McHargue was supposed to sign and date a chain of custody form at the Dayton Airport refrigerator when he removed the envelope, he forgot to do so. Nevertheless, he testified that he did indeed retrieve the envelope from the locked refrigerator on February 9, 2024, and immediately took it to the Miami Valley Regional Crime Laboratory, where it was received at 10:11 a.m. that day. Officer McHargue testified that when he retrieved the manila envelope containing the urine specimen from the refrigerator, it was sealed and did not appear to have been tampered with, destroyed, or opened. No tampering was observed during the transport of the specimen to the crime lab.

{¶ 24} Redmon testified to performing the biological testing on Weaver's urine specimen. Redmon explained the chain of custody and the procedures and methods she used to test the sample. Redmon testified that there were two tests performed for marijuana. First, there was the targeted drug screen to say whether something screened positive or negative. If there was a positive drug screen, then a second confirmation test would be done to confirm that the drug was there and to determine the concentration of it if possible. In Weaver's case, the initial screen was positive and the confirmation test showed that the urine was positive for 11-carboxy-delta-9-THC in a concentration of more than 100 nanograms per milliliter.

{¶ 25} On May 8, 2024, the trial court sustained in part and overruled in part Weaver's motion to suppress. The trial court found that Weaver's statements made in the back of the patrol car were not subject to suppression. The trial court then found that the officer had lacked reasonable, articulable suspicion to extend the traffic stop to conduct the field sobriety tests. Therefore, the court suppressed the field sobriety test results, the observations made and opinions formed by the officer while conducting the tests, and any statements taken or made by Weaver after he was subjected to the tests. The court further suppressed the results of the urine tests because, 1) the officer lacked probable cause to arrest, and 2) the urine specimen container had not been properly sealed in accordance with Ohio Adm.Code 3701-53-06(F). The State filed an appeal pursuant to R.C. 2945.67(A) and Crim.R. 12(K) and now raises four assignments of error.

## II. Waiver

{¶ 26} In its first assignment of error, the State argues that the trial court erroneously ruled on the issue of whether Officer Lykins had reasonable, articulable suspicion to extend the traffic stop and conduct field sobriety tests, because that issue was not raised at the beginning of the motion to suppress hearing. According to the State, Weaver waived his argument as to the lack of reasonable, articulable suspicion when he narrowed the issues at the start of the motion to suppress hearing. We do not agree.

{¶ 27} "To suppress evidence obtained pursuant to a warrantless search or seizure, the defendant must (1) demonstrate the lack of a warrant, and (2) raise the grounds upon which the validity of the search or seizure is challenged in such a manner

as to give the prosecutor notice of the basis for the challenge." *Xenia v. Wallace*, 37 Ohio St.3d 216 (1988), paragraph one of the syllabus. "By requiring the defendant to state with particularity the legal and factual issues to be resolved, the prosecutor and court are placed on notice of those issues to be heard and decided by the court and, by omission, those issues which are otherwise being waived." *State v. Shindler*, 70 Ohio St.3d 54, 58 (1994). "Failure on the part of the defendant to adequately raise the basis of his challenge constitutes a waiver of that issue on appeal." (Citations omitted.) *Wallace* at 218. "A trial court granting a motion to suppress on a basis not raised by the defendant's motion commits reversible error because the state must be provided an opportunity to present evidence and arguments to oppose the defendant's motion." (Citations omitted.) *State v. Wright*, 2024-Ohio-1763, ¶ 14 (1st Dist.).

{¶ 28} In both his initial motion to suppress and his amended motion to suppress, Weaver articulated that there had been a warrantless seizure and that the officer had lacked reasonable suspicion to conduct SFSTs. At the beginning of the suppression hearing, however, the prosecutor had asked the defense to put the issues for the motion to suppress on the record. The defense replied, "as stated in the motion just the stop, the administration of the field tests, the collection of the urine sample, and the testing of the urine sample." Tr. 5.

{¶ 29} Officer Lykins's testimony during the suppression hearing included information as to the reasons for making the traffic stop, his observations leading up to conducting the SFSTs, Weaver's completion of the tests, and the subsequent collection of Weaver's urine following his arrest. At the conclusion of the hearing, the trial court

permitted both parties the opportunity to make arguments. After reviewing the testimony presented by Officer Lykins leading up to having Weaver perform the SFSTs, the prosecutor stated, "Based on all that there's more than enough reasonable suspicion to ask the defendant to submit to field sobriety [testing] at that time." Tr. 97-98. Defense counsel countered the State's argument by relaying additional facts, then stating that, "I would argue, Your Honor, that's not enough reasonable suspicion to put Mr. Weaver through the field sobriety tests." Tr. 102.

{¶ 30} The State is correct that, when a defendant narrows the issues to be decided at a suppression hearing, arguments not made by the defendant at the hearing are deemed waived. *State v. Wintermeyer*, 2019-Ohio-5156, ¶ 19. This is because "[t]he prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the grounds of the challenge in order to rule on the evidentiary issues at the hearing and properly dispose of the merits." (Citation omitted.) *Wallace*, 37 Ohio St.3d at 218. But here, it is clear from the record that both parties were aware of Weaver's challenge to whether Officer Lykins had reasonable, articulable suspicion to conduct the SFSTs. The record reflects that Weaver included the particularized issue in his written motion to suppress, the State put forth evidence of Officer Lykins's reasonable, articulable suspicion at the hearing, and both parties argued during closing argument whether Officer Lykins had reasonable, articulable suspicion to conduct the SFSTs. We cannot conclude under these facts that Weaver waived the issue of whether Officer Lykins had reasonable, articulable suspicion to conduct the SFSTs.

{¶ 31} The State's first assignment of error is overruled.

### III.     Reasonable, Articulable Suspicion

**{¶ 32}** In its second assignment of error, the State contends that the trial court erred in sustaining Weaver's motion to suppress because Officer Lykins had reasonable, articulable suspicion that Weaver was driving under the influence to justify prolonging the traffic stop for the purpose of conducting field sobriety tests.    We agree.

**{¶ 33}** "Appellate review of a motion to suppress presents a mixed question of law and fact."    *State v. Burnside*, 2003-Ohio-5372, ¶ 8.    "At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." *State v. Brooks*, 75 Ohio St.3d 148, 154 (1996).    "Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence."    *Burnside* at ¶ 8*,* citing *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard."    *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 10 (4th Dist. 1997).

**{¶ 34}** The propriety of the initial stop of Weaver is not in dispute, since Officer Lykins personally observed traffic violations justifying a lawful stop.    Nor is there a challenge to the trial court's finding that Weaver's statements made while in the back seat of the police cruiser were not subject to suppression.    The issue here is whether Officer Lykins had reasonable, articulable suspicion that Weaver was driving under the influence of drugs and/or alcohol to further detain him to conduct field sobriety tests.

**{¶ 35}** "The Fourth Amendment to the United States Constitution and Section 14,

Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures." (Citation omitted.) *State v. Mays*, 2008-Ohio-4539, ¶ 7. "[I]f an officer's decision to stop a motorist for a criminal violation, including a traffic violation, is prompted by a reasonable and articulable suspicion considering all the circumstances, then the stop is constitutionally valid." *Id.* at ¶ 8. Nevertheless, once the stop has occurred, "the officer must have a reasonable, articulable suspicion that a person is driving under the influence to justify further detention for the administration of field sobriety tests." *State v. Brown*, 2012-Ohio-3099, ¶ 13 (2d Dist.), citing *State v. Santiago*, 2011-Ohio-5292, ¶ 11 (2d Dist.). "If there are no articulable facts that give rise to a suspicion of illegal activity, then the continued detention constitutes an illegal seizure." (Citations omitted.) *State v. Hess*, 2021-Ohio-3755, ¶ 17 (2d Dist.).

{¶ 36} "The level of suspicion required to meet the reasonable-suspicion standard 'is obviously less demanding than that for probable cause' and 'is considerably less than proof of wrongdoing by a preponderance of the evidence' but is 'something more than an "inchoate and unparticularized suspicion or 'hunch.'" ' " *State v. Hawkins*, 2019-Ohio-4210, ¶ 20, quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989), quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968). The existence of reasonable, articulable suspicion is determined by evaluating the totality of the circumstances, which must be viewed "through the eyes of the reasonable and prudent police officer on the scene who must react to events as they unfold." *State v. Gladman*, 2014-Ohio-2554, ¶ 14 (2d Dist.), quoting *State v. Heard*, 2003-Ohio-1047, ¶ 14 (2d Dist.). "A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by

those in law enforcement." *State v. Andrews*, 57 Ohio St.3d 86, 88 (1991), citing *United States v. Cortez*, 449 U.S. 411, 418 (1981). "Whether an officer had a reasonable, articulable suspicion to administer field sobriety tests is a 'very fact-intensive' determination." *Santiago* at ¶ 13, quoting *State v. Wells*, 2005-Ohio-5008, ¶ 9 (2d Dist.).

{¶ 37} The facts of this case are not in dispute and are supported by the record. In finding that Officer Lykins lacked reasonable, articulable suspicion, the trial court focused on the fact that Officer Lykins did not testify that there was a strong odor of burnt marijuana as opposed to a noticeable amount. Further, the trial court emphasized that Weaver was cooperative and able to respond to the officer's requests and that Weaver presented no dexterity issues prior to performing the SFSTs. Finally, the trial court characterized Weaver's multiple traffic violations as de minimis violations that could be reasonably explained by Weaver's unfamiliarity with the airport.

{¶ 38} Weaver relies upon prior decisions of this court holding that an odor of alcohol, or a slight or unspecified odor of alcohol, coupled with a de minimis traffic violation, glassy bloodshot eyes, and an admission to having consumed "a couple of beers" were insufficient to create a reasonable suspicion of driving under the influence and justify further detention to conduct field sobriety tests. *See State v. Spillers*, 2000 WL 299550 (2d Dist. Mar. 24, 2000); *State v. Morgan*, 2007-Ohio-6691 (2d Dist.); *State v. Nelson*, 2017-Ohio-2884 (2d Dist.); and *State v. Dixon*, 2000 WL 1760664 (2d Dist. Dec. 1, 2000). However, we have also stated that this court has "not required any specific number of indicators, nor have we adopted a balancing test" in determining whether an officer has reasonable, articulable suspicion to justify further detention to

conduct SFSTs. *State v. Adams*, 2017-Ohio-7743, ¶ 33 (2d Dist.). Rather, we have repeatedly stated that these cases are very fact-intensive, and we review the totality of the circumstances. *Santiago* at ¶ 13.

**{¶ 39}** In this case, Officer Lykins, a 21-year veteran of the police department, had extensive training in the detection of impaired drivers and was a certified drug recognition expert in the State of Ohio, which was recognized nationally. Officer Lykins observed Weaver driving the wrong way on a one-way street in clear daylight and making a U-turn in the middle of the road. Weaver then accelerated up to 15 mph over the speed limit. When Officer Lykins initiated the traffic stop, Weaver abruptly stopped his vehicle partially in the left lane of the roadway, straddling the shoulder. Unlike some of the other cases with de minimis traffic violations, such as a tinted-window infraction or a single marked-lane violation, abrupt stops and driving the wrong way on a one-way street are indicators of impairment. NHTSA manual, p. 140, 142 (braking properly can be a difficult task for an impaired driver and "there is a good chance the driver is DWI if you observe any type of stopping problem," including abrupt stops; "[f]ailing to yield right of way and driving the wrong way on a one way street are dangerous examples of vigilance problems" which are indicative of driving under the influence). Likewise, this court has found that driving 16 mph over the speed limit was not a de minimis traffic infraction and has noted that, "although speeding is not necessarily indicative of intoxication, it can be." *State v. Howard*, 2008-Ohio-2241, ¶ 14 (2d Dist.), citing *State v. Hall*, 2005-Ohio-6672, ¶ 11 (2d Dist.).

**{¶ 40}** Upon Officer Lykins's approaching the vehicle, Weaver lit up a cigarette,

which Officer Lykins testified was a recognized technique to mask odors. The fact that Officer Lykins did not smell the odor of marijuana while beside Weaver's vehicle was therefore not surprising. Weaver stated that he forgot his license and wallet at home and was not sure where the insurance and registration information for the vehicle were located; it was further discovered that Weaver had multiple license suspensions. Once Weaver was in the backseat of Officer Lykins's police car, Officer Lykins smelled the odor of burnt marijuana (as distinguished from raw marijuana), which indicated the odor came from Weaver's person and not the car or other occupant. Notably, Weaver admitted to having smoked marijuana approximately six hours prior to the traffic stop and stated that he smoked marijuana every day, which he said in a laughing tone. Weaver was also observed to have bloodshot eyes and droopy eyelids. According to the NHTSA manual, of which the trial court took judicial notice, general indicators of marijuana influence include bloodshot eyes, body tremors, disorientation, an odor of marijuana, and relaxed inhibitions. 2023 NHTSA Manual, p. 28.

{¶ 41} Although there may be reasonable explanations for some of Weaver's conduct, " '[a] determination that reasonable suspicion exists need not rule out the possibility of innocent conduct.' " *State v. Hawkins*, 2019-Ohio-4210, ¶ 22, quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Nor must an officer observe every possible indication that an individual is under the influence of a drug and/or alcohol in order to have reasonable, articulable suspicion to conduct field sobriety testing. *State v. Cook*, 2007-Ohio-707, at ¶ 19 (5th Dist.). Thus, although Weaver points out certain factors that were not indicative of intoxication, including Officer Lykins's failure to observe

slurred speech and that Weaver had no difficulty exiting the vehicle and was cooperative, the totality of the articulable facts supported the conclusion that reasonable, articulable suspicion existed. The determination of reasonable, articulable suspicion "is based on the *collection* of factors, not on the individual factors themselves." (Emphasis in original.) *State v. Batchili*, 2007-Ohio-2204, ¶ 19. Considering the totality of the circumstances, we conclude that there was sufficient reasonable, articulable suspicion that Weaver was driving while under the influence of a drug and/or alcohol to justify the administration of the field sobriety tests. Accordingly, we sustain the State's second assignment of error.

### IV. Officer's Observations

{¶ 42} In its third assignment of error, the State argues that, even if the field sobriety tests results were properly suppressed by the trial court, Officer Lykins could still testify at trial regarding his observations of Weaver during the performance of the field sobriety tests. In the motion to suppress, Weaver had argued two reasons why his field sobriety test results should have been suppressed. First, Weaver argued that the field sobriety tests had not been conducted in substantial compliance with the NHTSA standards. The trial court found that they were, in fact, conducted in substantial compliance with NHTSA standards, and this finding has not been challenged on appeal. The second reason Weaver raised was that there was no reasonable, articulable suspicion for Weaver's continued detention to conduct the SFSTs. The trial court suppressed the field sobriety test results, the observations and opinions of the officer conducting the tests, and any statements taken or made by Weaver after he was subjected to the tests based on the lack of reasonable, articulable suspicion. Because

we have concluded that Officer Lykins had reasonable, articulable suspicion to conduct the field sobriety tests, we necessarily conclude that the test results, observations, and statements were not properly suppressed. This third assignment of error is sustained.

## V. Fourth Assignment of Error

{¶ 43} In its fourth assignment of error, the State claims that the trial court erred in suppressing the results of Weaver's urine specimen, because Officer Lykins collected the sample, at a minimum, in substantial compliance with Ohio Adm.Code 3701-53-06(F). Weaver responds that the trial court correctly determined that "[a]bsent the field sobriety tests, there is no evidence supporting probable cause to arrest Mr. Weaver and to have him submit to providing urine to be tested." Appellee's Brief, p. 15. Weaver did not address the State's compliance with the Ohio Administrative Code.

{¶ 44} The trial court suppressed the results of Weaver's urine sample for two reasons. First, the trial court found that there was no probable cause for Weaver's arrest and, therefore, all evidence obtained from the arrest, including the results of his urine test, had to be suppressed. Second, the trial court found that even if the urine tests were not suppressed based on the lack of probable cause, the urine specimen container had not been properly sealed in accordance with Ohio Adm.Code 3701-53-06(F).

{¶ 45} Regarding probable cause, it is clear from the trial court's decision that due to its suppression of the SFSTs, the results of those tests were not considered as part of the court's probable cause analysis. Because the trial court has yet to consider the probable cause analysis with the inclusion of the SFST results and observations of Officer Lykins, we will not consider the issue for the first time on appeal. See *State v. Peagler*,

76 Ohio St.3d 496, 501 (1996). Thus, on remand, the trial court must reconsider the issue of probable cause to arrest with the SFST results and observations of Officer Lykins that were not previously considered. Accordingly, we will not address the trial court's first reason to suppress the urinalysis results.

{¶ 46} However, we will consider the trial court's second reason for suppressing the urine test results because if, on remand, the trial court were to find sufficient probable cause for the arrest, then there would still be a question of whether the urine test results should be suppressed due to the alleged failure to comply with the Ohio Administrative Code. The trial court found that, because the urine specimen container was not properly sealed pursuant to Ohio Adm.Code 3701-53-06(F), it was subject to suppression. Specifically, the trial court suppressed that evidence because Weaver's urine specimen container "was not sealed when it was received by the forensic toxicology technician, who testified she was unable to confirm if any tampering had occurred." Entry Granting Defendant's Amended Motion to Suppress Evidence Except for Statements in Cruiser (May 8, 2024), p. 15. We do not agree.

{¶ 47} "R.C. 4511.19(D)(1)(b) and R.C. 3701.143 authorize the director of health to promulgate regulations for analyzing bodily substances for purposes of R.C. 4511.19(A)." *State v. Faulkner*, 2021-Ohio-733, ¶ 14 (2d Dist.). Regulations governing the collection, handling, and analysis of bodily substances are set forth in Ohio Adm.Code Chapter 3701-53. *State v. Moore*, 2021-Ohio-1114, ¶ 27 (2d Dist.). "After a defendant challenges the validity of test results in a pretrial motion, the state has the burden to show that the test was administered in substantial compliance with the regulations prescribed

by the Director of Health." *Burnside*, 2003-Ohio-5372, at ¶ 24. Errors that are excusable under the substantial-compliance standard include only "minor procedural deviations" from the proscribed standards. *Id.* at ¶ 34, quoting *State v. Homan*, 89 Ohio St.3d 421, 426 (2000). "Once the state has satisfied this burden and created a presumption of admissibility, the burden then shifts to the defendant to rebut that presumption by demonstrating that he was prejudiced by anything less than strict compliance." *Id.*, citing *State v. Brown*, 109 Ohio App.3d 629, 632 (4th Dist. 1996).

{¶ 48} Relevant here, Ohio Adm.Code 3701-53-06(F) states that:

Blood, urine, and oral fluid containers are to be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:

(1) Name of subject;

(2) Date and time of collection;

(3) Name or initials of person collecting the sample; and

(4) Name or initials of person sealing the sample.

{¶ 49} Officer Lykins testified that he collected the urine sample using a urine specimen kit provided by the Miami Valley Regional Crime Laboratory. The State presented photographs at the suppression hearing showing that the label on the urine specimen container included the citation number, Weaver's name, the collection date and time of February 4, 2023, at 2:10 p.m., and Officer Lykins's name as the witness.

{¶ 50} Officer Lykins testified that he verified the urine collection tube was clean and sealed prior to Weaver's providing a urine sample. Officer Lykins collected the urine

specimen from Weaver while wearing gloves. Officer Lykins then placed the closed tube containing the urine specimen inside the plastic bag to prevent any spillage, sealed it, and placed it inside the manila envelope, which was then sealed with clear tape, signed, and dated by him. Officer Lykins testified that the photograph taken by Walker-Valle showing the outside of the manila envelope was in the same condition as when he sealed it. The sample was then placed in a locked OVI evidence refrigerator, which Officer Lykins verified was working properly, on February 4, 2023, at 2:15 p.m., until the specimen could be transported to the lab.

{¶ 51} The record indicates that the envelope containing the urine specimen remained locked inside the police department's evidence refrigerator until Officer McHargue retrieved it and took it directly to the Miami Valley Regional Crime Laboratory. No indication of tampering was apparent during the transportation of the urine specimen to the laboratory. The lab's chain of custody report documented that the urine specimen was received from "B. McHargue" on February 9, 2023, and given to Cody Miller, an individual who worked in the front office at the lab and who entered the evidence into the laboratory's tracking system and created a unique bar code to track the evidence while it was at the lab. The manila envelope containing the urine specimen was placed in the lab's property room refrigerator. From the refrigerator, the envelope was provided to Walker-Valle, who documented the manila envelope and urine specimen with photos and itemized the evidence inside the envelope. She testified that while taking pictures and documenting the specimen, no seal was observed on the test tube-like container itself. Because there was no seal observed on the tube itself, Walker-Valle stated, "I can't say

whether or not something had happened to that tube prior to our (inaudible)." Walker-Valle testified that typically they do see seals on the test tube-like container itself, which is done to prevent tampering. However, when she received the container, it was closed and located inside the manila envelope, which was sealed and undamaged. She did not observe anything leaking, and the external envelope was neither leaking nor wet. Thus, there was no indication that the sealed manila envelope had been opened, damaged, or tampered with, which would have allowed the test tube-like container inside the sealed envelope to be opened, damaged, or tampered with.

{¶ 52} A prior version of the Ohio Administrative Code required that the urine container "shall be sealed with a gummed tape or sticker." *State v. Butt*, 1997 WL 568013, *4 (2d Dist. Aug. 29, 1997). However, the applicable requirement at the time of this case stated that a urine container is "to be sealed in a manner such that tampering can be detected." Compare former Ohio Adm.Code 3701-53-05(E) to current Ohio Adm.Code 3701-53-06(F). Considering the change in language, the current requirement permits more flexibility in how a urine specimen may be sealed. While it may be preferable for the test tube-like container itself to be sealed with tape as the prior code section required, that is no longer necessary so long as the container is sealed in a manner such that tampering can be detected. "The purpose of the sealing requirements described in [Ohio Adm.Code 3701-53-06(F)] is to insure that the blood [or urine] specimen is the same specimen that was placed in its container by the person who collected it from the defendant, and [that] it is in the same condition as when it was put there." *State v. Roberts*, 2009-Ohio-1799, ¶ 6 (1st Dist.), quoting *Butt* at *4. This allows

for an outer package containing the sample to be sufficiently sealed in a manner such that tampering can be detected.

{¶ 53} Here, the State presented the chain of custody for each individual involved in collecting, transporting, and testing Weaver's urine sample. There was no evidence of tampering or any indication that tampering occurred. On the contrary, the testimony from the motion to suppress hearing reflected that the manila envelope that contained Weaver's urine specimen remained sealed and undamaged from the time Officer Lykins sealed it until it was opened at the laboratory for testing. Additionally, Officer Lykins initialed and dated the seal itself, which would have allowed detection of any tampering with the envelope. Accordingly, we conclude that the trial court erred in finding that the State did not meet its burden of showing at least substantial compliance with Ohio Adm.Code 3701-53-06(F).

{¶ 54} Because the trial court must determine in the first instance whether Officer Lykins had probable cause to arrest Weaver, the fourth assignment of error is sustained in part and overruled in part.

## VI. Conclusion

{¶ 55} Having sustained the State's second assignment of error and part of its fourth assignment of error, we will reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.